FILED '06 FEB 09 08:17 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| TERESA TEATER, | ) | |
| | ) | No. CV-05-1546-HU |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | OPINION AND ORDER |
| CITY OF OREGON CITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Teresa E.A. Teater
815 Harrison Street # 4
Oregon City, Oregon 97045
    Pro se

MOSMAN, District Judge:

　　Plaintiff Teresa Teater brings this action *pro se* for money damages, asserting claims for violation of her civil rights and for disability discrimination, as well as "under the common laws of the District of Oregon." Defendants are the City of Oregon City,

1 - OPINION AND ORDER

Oregon, the Mayor of Oregon City, the Oregon City Police Department, the Oregon City Chief of Police, and 13 Oregon City police officers. She moves to proceed in forma pauperis (doc. # 1).

This is one of three actions brought in 2005 by Ms. Teater: the other two are <u>Teater v. Pfizer, Inc., and Parke-Davis</u>, CV 05-589-HU, a personal injury products liability action conditionally transferred to the United District Court for the District of Massachusetts pursuant to MDL Docket # 1629; and <u>Teater v. Schrader et al.</u>, CV 05-623-HU, asserting claims under the False Claims Act, the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and 42 U.S.C. § 1983.

The complaint is lengthy, single-spaced and without numbered paragraphs. Plaintiff alleges that she was falsely arrested; deprived of her property; falsely imprisoned; and subjected to unreasonable search and seizure, assault and battery, excessive use of force, denial of medical attention, and "improper detainment of a disabled person." She also asserts claims based on defendants' failure to: monitor her while in jail, give evidentiary receipts, handle evidence properly, investigate her claims of abuse of a disabled person by a doctor, protect her as an endangered disabled person, investigate pharmacy fraud, and investigate police misconduct. She alleges that defendants created or effected a policy, written or unwritten, spoken or unspoken, to "exclude the Plaintiff Teater Disability Classification," and fail to accord her

2 - OPINION AND ORDER

rights "in access to all aspects of City Government and Public Safety Allowed by U.S. Federal and Oregon State Law and Civil Law." Ms. Teater also alleges "attempted coercion of a false statement from the plaintiff," "continuous stalking of the Plaintiff," denial of access to police investigation of thefts from her home and arrests of suspects, retaliatory behavior to coerce her to drop Tort Claim Notices for her pending lawsuit, and harassment over civil rights activities.

The facts alleged are that on August 15, 2003, plaintiff entered the Oregon City Police Department and explained to Lt. Jarvis that she was being denied medication for a "condition called Bipolar for over 3 weeks due to Doctors at facility not coming up with the co pays as they had in the past." Lt. Jarvis said he would accompany Ms. Teater to Clackamas County Mental Health. Plaintiff alleges that she explained to Lt. Jarvis all about the "Pfizer scandal re: the Neurontin pill Plaintiff should not ever have been on ... and presented Lt. Jarvis with a huge xerox box full of about 78 or so almost empty Neurontin pill bottles. For which he never gave Plaintiff evidentiary receipts for."

Lt. Jarvis and Officer Hutteball went with Ms. Teater to Clackamas County Mental Health, and to her former residence to "retrieve a written note from front door left by a case manager regarding the co pays." Lt. Jarvis allegedly retrieved the note, but never gave Ms. Teater an evidentiary receipt for it. Lt. Jarvis

and Officer Hutteball allegedly then took Ms. Teater to a pharmacy in Canby, Oregon. Ms. Teater explained to Lt. Jarvis that she "discovered that the diabetic test strips she had been getting in Canby at the Pharmacy ... was stating illegally on the box that a doctor had prescribed them," but in fact they had never been prescribed. Ms. Teater asked Lt. Jarvis to "note it" when they went inside the pharmacy, and Ms. Teater "had the product billed to the Oregon health plan, that it was a fraud to do so in the wrong doctors name." Lt. Jarvis drove Ms. Teater home, and Teater asked Lt. Jarvis to "keep possession of a huge xerox box full of empty Pfizer Pill bottles, for a possible investigation."

The next day, Ms. Teater alleges, she again went to the Police Department and spoke to Lt. Jarvis and "gave him all the pill bottles from the previous Friday of all the med errors from the pharmacy, taped to 4 x 5 pieces of paper and there were about 8 of them, and again he gave Plaintiff no evidentiary receipt." Ms. Teater alleges that she began to send e-mails to Lt. Jarvis about "her frustrations of the lack of her protective custody that she thought was under with the police department when Plaintiff armed the Lt. Jarvis With the Disabled endangered persons Oregon Statutes on the morning of August 15th 2003." Ms. Teater alleges that Lt. Jarvis's only response was a "short worded e-mail that stated the Lt. Felt Plaintiff was having a problem with her medication, and to go to her doctors."

On August 20, 2003, Ms. Teater alleges that she returned to the police department and presented Lt. Jarvis with a copy of a new Oregon law providing that "persons incarcerated in corrections That are mentally ill, will get *continuity of care* before being released from custody..."

On August 29, Ms. Teater returned to the police department, where she encountered Lt. Conrad. Ms. Teater requested a copy of Lt. Jarvis's report on "what he had done regarding the Plaintiff, Teater." Lt. Conrad told Ms. Teater "that there was no investigation, and did Plaintiff receive the Email that he and the Lt. Jarvis had sent? And that there were no pill bottles in the building."

Ms. Teater alleges that "Plaintiff became infuriated and yelled at the Defendant, that he was a dirty cop Who promptly came around the counter and tried to pull her property and tell her to leave the building." Plaintiff left. Two days later, Ms. Teater alleges, she "had only been on medication one and a half weeks, not adjusting well to it or rejection of not getting her property back ... tried to get an Oregon City Police Officer Bob Downing in the back parking lot to listen to Plaintiff and go look for her pill bottles." Plaintiff then allegedly spotted two other Oregon City police officers "coming toward her in a menacing way," and she retreated.

On September 30, Ms. Teater alleges, she "had occasion to

remove from her Doctors office in Oregon City, Oregon her own Medical file ... in which The Plaintiff felt Doctor would not let Plaintiff access the Discovery that Plaintiff found Regarding another person's medical info and social security number stamped in ink over Plaintiff's personal records."

She alleges that the Oregon City Police department was called and that officers Edwards and Johnston responded and a "plan to arrest the Plaintiff ... was put into action." However, Ms. Teater had "on her own returned the said medical file 5 hours later that night at 11:20 p.m. thru a janitor vacuuming the facility." Nevertheless, Oregon City police "repeatedly came to Plaintiff's home," but because Ms. Teater was "deathly ill with bronchitis" and "heavily sedated," she had "not really noted their presence until the evening of October 7, 2003." At that time, Officer Edwards was at her door and asked her to come outside and talk. Ms. Teater alleges that when she tried to put on her shoes, officer Edwards "was being very aggressive. With holding onto the door, and had not stated the purpose of his visit, nor did not want to remove his foot." Ms. Teater alleges that she was badgered "over and over relentlessly about Plaintiff having took a Medical File. And that said File was in Plaintiffs home and that Plaintiff Teater needed to confess to taking it and let them have it back." Ms. Teater alleges that "over and over deny it all and becoming frustrated but not out of control in any way with the Defendant Police Officer

6 - OPINION AND ORDER

Brad Edwards, just told him to go head and arrest her all ready." So "Defendant Edwards threw down his notebook and grabbed the Plaintiff, Teater and attempted to Handcuff and arrests the Plaintiff Falsely." Ms. Teater alleges that she was in shock, "not believing plaintiff was getting arrested realized plaintiff needed house keys and was slightly turning body, nor not trying to escape not handcuffed fully, so the Defendant ... Edwards Grabbed onto the Plaintiffs hair and violently snapped her head back and at the same time threaten to pepper spray the Plaintiff."

Ms. Teater alleges that she was then driven to the jail with all the windows down, "knowing full well Plaintiff had told him of her severe bronchitis," and charged with theft.

Ms. Teater alleges that at that moment, she "was being severely malpractice on, and on 4 medications that she need to not be in jesting had she known, and she had just come off Celexa on the 30th of Sept, 2003, which had made her hypo manic for years."

The charges of theft and resisting arrest were subsequently dismissed on April 10, 2004 by Judge McNiece, but plaintiff alleges that Judge McNiece committed civil rights violations when, on December 14, 2004, she "verbally replied to a request to Plaintiff, thru court appointed counsel Karen Brisbane, for Plaintiff to be able to come to City Hall meetings that were held in the very same room and at the same exact Bench that Plaintiff was facing at that Moment, that the Mayor sat in as well to conduct those meetings."

Judge McNeice allegedly told Ms. Teater she had "lost her Privilage," and "continued to argue down Plaintiffs rights to access Police Protection, in the event Teater was Raped or anything else, the Judge stated that Plaintiff Teater was to only get the Clackamas County Sheriff to respond, or the Oregon State Police."

Plaintiff alleges that after "100 or so phone calls to the Oregon City Police department since 2003 through 2005 ... and to the Mayor in Person and at City hall meetings and written requests ... Plaintiff still cannot get the Thefts to her Apartment investigated... and but for the actions of all the defendants listed, she would not still be distressed and suffer from PTSD Nor can she get her personal property back."

Ms. Teater alleges that she was not made aware that her doctors had removed the diagnosis of Bipolar from her chart and had "attributed the Paxil/Celexa/Neurontin ??? As the Medical problem for the prior 2 years. Plaintiff Teater suffers only from chronic Post Traumatic Stress Disorder and a thyroid disorder."

Plaintiff alleges that from "October of 2003 thru June of 2004 Plaintiff had occasion to have many encounters with the Oregon City Police Department out on the Streets," and that an officer named Matt Harikian, who had night patrol where Plaintiff formerly lived, "went so far as to bring a female Sergeant named Valenzuela to Plaintiff one evening and tell Plaintiff that the Sergeant will arrest Plaintiff if Plaintiff ever calls 911 ever again." This was

8 - OPINION AND ORDER

allegedly because Plaintiff had become overcome with car paint fumes and requested that the police issue a citation to the man painting the car. Plaintiff alleges that officer Harikian also once threatened to arrest her when she tried to hang a garage sale sign on a light pole, and that he "continued over the months to stop his patrol car in the middle of the night and harass the Plaintiff, Teater, whom was walking her pet in the middle of the night ... while in a hypo manic/insomnia state of mind due to the malpractice and it was relentless no less than 20 times in 3 months."

Ms. Teater alleges that she was a civil rights activist and that comments have been directed to her over and over by Oregon City police officers involving shootings by the Portland Police Bureau of suspects during car stops. She alleges that she has been subjected to such racial slurs as "N-lover" when officers drive by her.

Plaintiff alleges that she has repeatedly called the Oregon City police department about the managers of her former residence trespassing and possibly stealing from her, but that the police have not investigated the complaints. The managers of her former residence were allegedly subsequently arrested for theft, drug possession, and a connection to a pipe bomb.

Ms. Teater alleges that on June 4, 2004, she had been released from a two-day police hold at St. Vincent's Hospital, "where Drs state that Plaintiff appears to be bipolar and referred her to her

own Doctors whom were still malpractice upon her in Oregon City." Ms. Teater alleges that she was ordered to seek medication from them and went there with her former pastor, who witnessed the doctors' refusal to give plaintiff service and medication. Plaintiff then asked the pastor to "escort her to the nearest Police department for protective custody of a disabled person being denied medical care by a doctor."

When plaintiff and her pastor went into the Oregon City police department, officers Hutteball, Band and Laird separated her from the pastor and informed Ms. Teater that she was under arrest for trespassing into the police department. Plaintiff alleges that she was taken to the back of the police department, "denied her medical treatment," and eventually told by Lt. Conrad that "even though she had apologized by phone about 6 months earlier, it was a LIFETIME TRESPASS and no matter what Plaintiff was not to come into the building ever again." Plaintiff alleges that she was taken three blocks to the jail and "was driven violently and thrown all over the back seat." At the jail, she was "stripped of her Expired Drivers License" by the police, even though it was her only form of identification and she had no money to get a state-issued identification card.

Ms. Teater alleges that she was placed in a holding cell with a woman who had just witnessed her friend "get killed or die" two hours earlier. Plaintiff alleges that she asked to be lodged

somewhere else, and that she was "handcuffed to a wall for 5 hours until her release." Ms. Teater also alleges that her former mental health case manager was brought to the jail to assess her and "ditched Plaintiff." Ms. Teater alleges that she was "denied treatment 3 times in one day for a hospital order from a police release/hold from Multnomah County, Oregon," and that jail personnel refused to give her "diabetic food" or ice.

Ms. Teater alleges that she was "left to fend for her own devices" when let out of jail and "walk Home at midnight, yet the Oregon City Police Officers that stop Plaintiff Constantly tell Plaintiff ... it's not safe out there alone."

Ms. Teater alleges that but for "the actions of the named defendants to deprive Plaintiff of protection and listen to her concerns, she had to suffer for a second year more medical malpractice that Plaintiff would have discovered even sooner in 2003 if the Oregon City Police department had really turned her case over to adult protective services."

Ms. Teater alleges that in June 2005, she was "doing measurements on a car on private property at about 1:30 a.m." She alleges that she was "doing some private ... enactment work related to the [Kendra James] death." An Oregon City police officer began questioning Plaintiff, using his flashlight to examine paper belonging to her and making "dehumanizing remarks to Plaintiff ... regarding his beliefs of her mental state from the past, and felt

she was still the same and was never going to be anybody but the way all the Officer's said Plaintiff was." Ms. Teater alleges that she went home and made a call back to the officer's answering machine complaining about his remarks, and after that night, the officer "stalked Plaintiff on a nightly basis in his cruiser," driving slowly and smiling. Ms. Teater alleges that the same officer would park his cruiser "on corners where Plaintiff was reading papers late at night and watch Plaintiff for a while." Ms. Teater alleges that she "started to contact" the officer's answering machine "on a nightly basis" because she was again suffering from Post Traumatic Stress Disorder and tried sending him e-mails, but that he continued to stalk her "until the Justice John Roberts Confirmation week in Sept." She alleges that he then would "keep finding cars with headlights out and bringing them from 2 city blocks away to write their tickets 20 feet away from Plaintiff."

Ms. Teater alleges that the officer stalked her while she was riding on a bus, which caused her to go to bed for two days in a depressed state and to make calls to the officer's answering machine. She alleges that the officer passed her at a local bus stop and smiled at her, then two other officers told Ms. Teater she would be arrested if she ever called the officer's answering machine again. Ms. Teater alleges that her efforts to make other officers aware of the stalking were met with indifference.

Ms. Teater alleges that in July 2005, members of her family visiting from Omaha, Nebraska burglarized her, removing "objects from her home in some manner that Plaintiff suspects involves outside help," and that she was "almost assaulted by a family member during this visit." Ms. Teater alleges that when she was aware of the thefts her "over 145 calls to the Oregon City Police Department ... was refused. No return calls were made."

Ms. Teater alleges that she saw the Mayor of Oregon City at an antiques fair, and that the Mayor got up and left her purse behind "she was in such a hurry to get away from Plaintiff."

Ms. Teater alleges that on July 7, 2005, an officer returned one of her calls about the theft and "pretended to be concerned and gave a fictious case number when Plaintiff called back for one." She alleges that the officer told her "there was no budget for an out of state investigation and hung up."

Ms. Teater alleges that in July 2005, she had a "complete PTSD breakdown from what Family had done to her" and called 911. When police officers arrived, she got into a dispute with the police about the Kendra James shooting and "went into a full disassociative state of mind and got transported finally by ambulance to Adventist hospital," where one of the defendants placed her on a police hold. She alleges that she has still received no police investigation into the thefts by her family at her home.

Ms. Teater alleges that when she was riding her bicycle, a police officer made a sharp left turn onto Harrison Street in front of her and "plaintiff was about 15 feet from the Cruiser and darn near got hit and killed." She alleges that she later saw the officer near her house, even though she was "aware that nothing happened on her block at that time." She alleges that this conduct constituted "harassment and intimidation," and that the "behavior is life threatening in that Plaintiff could have massive injuries if hit by the Officers cop car." Ms. Teater alleges that she made a call to the FBI office in Portland regarding this action, and to Lt. Conrad.

Ms. Teater alleges that it was the "policies and or custom" of the City of Oregon City to "inadequately and improperly investigate citizen complaints, as evidenced by" the deaths of the two girls murdered in Oregon City by Ward Weaver, as well as "citizen complaints of Police misconduct" which were tolerated. She alleges that it was the policy and custom of the City of Oregon City to inadequately train or supervise officers.

Ms. Teater requests damages in the sum of $20 million and "mandatory sanctions and in-service trainings of the whole Police department and it's employee's as well as it's Mayor," a "verbal and written apology from each and every Police Officer in the Oregon City Police Department and the Mayor of Oregon City, Oregon," a "proper Internal affairs division as well as a citizens

officer review board," and "Mental Health awareness training as required by Oregon state law of all Oregon City Police Officers as well as the Mayor."

## Standards

Pursuant to the federal *in forma pauperis* statute, codified at 28 U.S.C. § 1915(d), the court is authorized to dismiss an *in forma pauperis* complaint before service of process "if satisfied that the action is frivolous or malicious." Denton v. Hernandez, 504 U.S. 25, 31 (1992).

The *in forma pauperis* statute differs from Rule 12(b)(6) because the statute "accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989).

A complaint is frivolous "where it lacks an arguable basis in law or in fact." Neitzke, 490 U.S. at 325; *see also* McKeever v. Block, 932 F.2d 795, 798 (9th Cir. 1991), or when the facts alleged are irrational or incredible. Denton v. Hernandez, 504 U.S. 25, 33 (1992). The facts alleged in the complaint are irrational, and I am unable to discern from the allegations any claim having an arguable basis in law or fact. I conclude that the action is frivolous. The motion to proceed *in forma pauperis* is denied, and the action is

15 - OPINION AND ORDER

dismissed without prejudice.

IT IS SO ORDERED.

Dated this __8__ day of February 2006.

_____
Michael W. Mosman
United States District Judge

16 - OPINION AND ORDER